OPINION OF THE COURT
Kenneth R. Fisher, J.
Defendant moves pursuant to CPL 290.10 for a trial order of dismissal of the count charging robbery in the first degree, Penal Law § 160.15 (3), on the ground that the trial evidence is not legally sufficient to establish both the forcible taking element, and the use of a dangerous instrument element. The latter contention is based on the fact that the object stolen, a loaded pistol, is alleged to have been the dangerous instrument *589 used during the course of the robbery. For the reasons stated below, the motion is denied.
The Facts
Taking the evidence adduced on the People’s direct case in a proper light, as the court must at this stage (People v Contes, 60 NY2d 620, 621 [1983]), the jury would have a right to find the following: Rodrick Kennedy, an off-duty Monroe County Sheriffs Deputy, was on duty as a private security officer at the Motel 6 on Buell Road across from the airport in Rochester. The desk clerk on duty, who received a call that an unauthorized person had entered a guest’s room, told Kennedy to go up to the second floor of the motel to investigate. Upon arriving on the second floor, Kennedy saw the defendant entering a room with a passkey. Kennedy addressed the defendant, identified himself as a security officer, and asked if he could be of some help to the defendant. Defendant said that he was just going into his room. Kennedy asked him for his key card. Kennedy noticed that, as defendant handed the key to him, defendant’s thumb covered up the middle area of the key which revealed the master number. Kennedy tried to retrieve the key, but defendant tried to pull it back. The two men pulled the key back and forth until Kennedy was able to retrieve it. Kennedy then noticed that the key had the number “D3” imprinted on it, indicating that it was a master key card, not a guest card.
Kennedy then asked defendant to accompany him to the lobby, and said to defendant, “They gave you the wrong key. Let me take you down to get the right key.” The two men went to the lobby, with defendant walking ahead. Upon arrival at the lobby, Kennedy mouthed to the clerk, “Call the police.” The desk clerk called the police while defendant and Kennedy stood together in the lobby. During the call the defendant started to quickly walk toward the front door. Kennedy quickly intervened, and positioned himself between defendant and the door. Kennedy told defendant to relax, and said, “We’ll just see how you wound up with this card.”
Defendant went to the next exit, to the left of the front desk which was the passageway from which they came downstairs into the lobby. Kennedy described the defendant’s movements as “rather quick.” Kennedy again moved into a position between defendant and the door, and again advised him to relax, because they had to find out how defendant obtained the pass key. At that point, defendant said “Get the f * * * k out of the way.” Defendant grabbed Kennedy by the tie and shirt, and *590 tried to push him out of the way. Kennedy grabbed the defendant and the two men went through the lobby doorway, and began ascending the stairs.
Still continuing to struggle with each other, the two men arrived at the first stairway landing. Kennedy grabbed defendant in a bear hug from behind, and defendant struck Kennedy with an elbow, knocking Kennedy’s glasses off. Kennedy wound up in front of defendant, between him and the next flight of stairs to the second floor. Kennedy’s foot then hit the stairs, and he lost his footing, falling back onto the stairs as defendant was pushing on top of him. While defendant was on top of him, Kennedy felt a hand on the handle of his weapon, and felt the holster move in response to a tug. The defendant had his other hand on Kennedy’s shirt and tie. Kennedy looked at defendant’s hand on the weapon and, with a strong motion, swept defendant’s hand away from the weapon. Defendant let go of the weapon, broke free, and went up the stairs. Kennedy grabbed one of his feet, tripped him, and the two met again on the upper stairway landing. Just before defendant attempted to open the door at that landing, Kennedy grabbed him from behind in another bear hug.
Kennedy testified that, at that point, his gun “came out of the holster” and landed on the floor. The gun slid to a position in front of them, and both men lunged for it. Defendant was closer and got hold of it.[1] Kennedy applied yet another bear hug from behind, with his arms over defendant’s arms but above defendant’s elbows. Defendant had the gun in his right hand and managed to point it over his left shoulder at Kennedy. Defendant told Kennedy to let him go or he “will shoot your ass.”
Kennedy did not let defendant go, and defendant brought the gun down in front of him near his other hand, where he “racked” the weapon. Kennedy saw a bullet eject from the chamber and fall to the ground, and knew that the fully loaded magazine would load another bullet into the chamber. Defendant kept saying, “Let me go or I’ll shoot your ass.” Defendant wiggled out of Kennedy’s hold, broke free, turned around, and, *591 with his right arm extended, pointed the gun at Kennedy, stating, “I’ll shoot your ass.” Kennedy said, “Drop the weapon, you don’t want to do this.” Defendant then turned sideways with the weapon still pointed at Kennedy, and side stepped toward the rooms down the hallway. Once free of the doorway, he ran down the hallway, while Kennedy took cover behind the door.
Kennedy next saw defendant running down Buell Road toward the Town of Chili. As Kennedy ran after defendant on Buell Road, he called 911. When defendant approached the railroad tracks, Kennedy lost sight of him. Officers responding to the scene eventually apprehended defendant after a chase. The gun was found in a wooded area about 15 feet from the railroad tracks.
Discussion
Defendant contends that he cannot be guilty of robbery in the first degree when the object of the forcible theft, the gun taken from the victim, is the dangerous instrumentality alleged to have been used by the defendant during the course of the robbery. Under the statute, a defendant “is guilty of robbery in the first degree when he forcibly steals property and when, in the course of the commission of the crime or of immediate flight therefrom, he * * * [u]ses or threatens the immediate use of a dangerous instrument.” (Penal Law § 160.15 [3].)
The case of People v Williams (63 AD2d 1035, 1035 [2d Dept 1978]) held that “[t]he fact that the stolen property was a deadly weapon does not in and of itself convert the robbery into a robbery in the first degree, i.e., robbery while armed with a deadly weapon.” (Id. [emphasis supplied] [construing Penal Law § 160.15 (2)] [forcible theft “when, in the course of the commission of the crime or of immediate flight therefrom, he * * * [i]s armed with a deadly weapon”].) After Williams, it was reasonable to conclude that a conviction for first degree robbery would be upheld in these circumstances if something more than mere possession of the stolen gun was present after the taking, e.g., use of the weapon stolen during “the [remaining] course of the commission of the crime, or the immediate flight therefrom” (Penal Law § 160.15 [preamble]), thereby in some manner aiding the robbery or defendant’s immediate flight. Otherwise, the “in and of itself’ language in Williams would be gratuitous.
The case of People v Diaz (129 AD2d 968 [4th Dept 1987]) followed this expected formulation, and upheld a first degree robbery conviction in a car theft case, when it was shown that *592 the car was used as a dangerous instrument against a victim during defendant’s immediate flight from the scene of the theft. Although there was an unexplained reference in Diaz to Williams having been decided under subdivision (2) of the statute (“armed with a deadly weapon”), not subdivision (3) (“uses or threatens the immediate use of a dangerous instrument”) which was at issue in Diaz, the latter Court maintained that a first degree robbery could occur in “the unusual circumstances of the present case,” when defendant used the car as a dangerous instrument during immediate flight from the theft. (Id.., 129 AD2d at 969.) It is significant that, in Diaz, the car was originally taken while unattended, and that defendant’s use of the car as a dangerous instrument began only after the owner immediately jumped on the hood of the car to stop or impede defendant’s asportation of the stolen property.
Diaz would seem to be dispositive of the question in this case. The jury would have a right to find on this evidence that defendant used the gun to complete his theft of it and to aid his escape. First, defendant pointed the gun over his left shoulder toward Kennedy in an effort, coupled with a verbal threat, to break Kennedy’s bear hug on him. Second, he brought the gun down to his other hand when Kennedy did not immediately release him, and he “racked” the weapon in an obvious effort to be sure that a round was in the chamber. And third, defendant broke free of Kennedy, turned around, and pointed the gun at him in an effort, again coupled with repeated verbal threats, to induce Kennedy to give up the endeavor. Under the rationale of Williams and Diaz, coupled with the preamble of Penal Law § 160.15, the loaded gun was clearly “used” to complete the forcible theft of it and to aid defendant’s immediate flight therefrom. On virtually identical facts, and upon the same reasoning under a similar statute, an armed robbery conviction was upheld in Commonwealth v Dedrick (33 Mass App 161, 166-167, 597 NE2d 66, 69-70 [1992]; see also, State v Handburgh, 119 Wash 2d 284, 290-293, 830 P2d 641, 644-645 [1992] [comprehensive discussion of the subject and collecting authorities]). On these facts, the ultimate determination of the issue should be one of fact by the jury, not of law by the court.
But People v Dinsio (286 AD2d 517 [3d Dept 2001]) appears to hold to the contrary, and must be examined. Purporting to rely on Williams, in a case which, like this one, involved a scuffle during which the defendant seized the victim’s gun and then threatened the victim with it by pointing it at his head, the Court reversed a conviction under section 160.15 (2). *593 Notwithstanding that the defendant used the weapon stolen to subdue the victim and to gain access to a hiding place for the purpose of avoiding police detection, the Court held, “while defendant] w[as] shown to have robbed Rauch of his weapon, there was no proof that they robbed him with a weapon. Put another way, the weapon was the property stolen rather than the means by which property was stolen.” (People v Dinsio, 286 AD2d at 519.) No explanation was given, either of why Williams’s “in and of itself’ language would not call for a different result, or of why Diaz’s reasoning, albeit under section 160.15 (3), would not support the conviction. Moreover, there was no treatment of the statute, which on its face would support the conviction on the theory that the defendant was armed with a weapon during immediate flight from the location of the robbery, and used it to aid the intended completion of a robbery, or immediate flight therefrom. (Cf, People v Stokes, 88 NY2d 618, 627 [1996]; People v Hernandez, 82 NY2d 309, 319 [1993]; People v Gladman, 41 NY2d 123, 129 [1976] [all construing identical language under the felony murder statute, Penal Law § 125.25 (3), which, for purposes of the present analysis, should be read in pari materia with the preamble to Penal Law § 160.15]; People v Carr-El, 99 NY2d 546 [2002].)
The treatment of Diaz in Dinsio is ambiguous, because it is not clear whether the Court simply disagreed with it (and also did not accept the “in and of itself’ articulation of the rule in Williams), or was distinguishing it as having been decided under the dangerous instrument formulation of robbery in the first degree (Penal Law § 160.15 [3]). This ambiguity need not be resolved, however, because under either explanation for the Court’s decision in Dinsio, this court must follow Diaz. If the former explanation is accurate, this court must follow Diaz because it was decided by the Fourth Department, and where conflicting Appellate Division decisions are present, the court must follow the decision of its own Appellate Division. (1 Carmody-Wait 2d, NY Prac § 2:276, at 477.) If the latter explanation is accurate, then this court must follow Diaz because this case, like Diaz, involves a charge under section 160.15 (3) (using a dangerous instrument). The core requirement is that the People prove that the defendant used and “actually possessed a dangerous instrument at the time of the crime” (People v Pena, 50 NY2d 400, 407 [1980]), which is defined under the statute to encompass “the course of the commission of the crime or of immediate flight therefrom.” (Penal *594 Law § 160.15 [preamble].)[2] If the defendant possessed and used the car in Diaz at “the time of the crime,” as the Court held that he did, the People have presented a prima facie case here.
Conclusion
Accordingly, the motion for a trial order of dismissal is denied.

. On these facts, the court has no difficulty in finding the forcible theft element established. (People v Figueroa, 219 AD2d 509 [1st Dept 1995].) Defendant retained the property stolen, so the problem of abandonment in People v Nixon (156 AD2d 144 [1st Dept 1989]) is not present here. (People v Smith, 79 NY2d 309 [1992]; People v Bachmann, 237 AD2d 897 [4th Dept 1997]; People v Rudelt, 6 AD2d 640, 642 [3d Dept 1958]; see generally, Dixon v State, 673 A2d 1220, 1226-1227 [Del 1996].)

. Model Penal Code § 222.1 (1) (1962) defines “in the course of committing a theft” as including “in an attempt to commit theft or in flight after the attempt or commission.” For a collection of cases, see Annotation, Use of Force or Intimidation in Retaining Property or in Attempting to Escape, Rather Than in Taking Property, as Element of Property, 93 ALR3d 643 (1979). (See generally, 2 W.R. LaFave and A.W. Scott, Jr., Substantive Criminal Law § 8.11 [f]; n 110 [1986].)